PURITAN HOMES, INC., Appellant,

v.

William E. ABELL et al., Appellees.

Court of Appeals of Kentucky.

May 10, 1968.

Rehearing Denied Nov. 8, 1968.

Preston L. Terry, III, Delahanty & Terry, Louisville, for appellant.

Howard B. Hunt, Louisville, James A. Hall, LaGrange, for appellees.

PALMORE, Judge.

Puritan Homes, Inc., brought this suit against William Emmett Abell and wife, Virginia Abell, for specific performance of a written contract by which the Abells had agreed to sell it their 250-acre farm in Old-ham County for $75,000. The trial court denied specific enforcement on the ground that the Abells' execution of the contract had been inequitably induced. Puritan appeals. It is our opinion that the judgment was in error and that Puritan is entitled to specific performance.

The Abells were represented in the transaction by Jesse Dixon, an attorney and realtor who also is master commissioner of the Oldham Circuit Court. Dixon's place of business is in LaGrange, county seat of Oldham County. Puritan was represented by its president and chief stockholder, H. M. Dunn, Jr., who is a real estate broker and is engaged in building and developing and in several other business activities, including cattle and show horses. Over the years prior to the events here in question both Dunn and Abell had done business with Dixon.

The contract was drawn by Dixon and signed by the parties on Saturday, March 23, 1966. A month earlier, on February 22, 1966, Abell had called Dixon on the telephone for the purpose of enlisting his services in selling the farm. On the next day, February 23, Dixon went out to the Abell home and the Abells signed a listing agreement giving Dixon the exclusive agency at a 5% commission to sell the property for $75,000 on terms of 25% cash and the balance payable over a period of seven years.

The contract ultimately signed by the parties called for a price of $75,000, payable 10% down, 19% on passage of title, $6,250 in one year, $6,000 in two years, $6,000 in three years, and the balance in seven annual installments of $5,000 each, all deferred payments bearing 6% interest payable annually.[1]

At some time during the month between February 23 and March 23 Dunn contacted Dixon and told him he was looking for a farm. Dixon showed him some 14 farms, including the Abell place. Dixon testified

---

1. In other words, 29% cash and the balance payable over 10 years.

also that he had shown the Abell place to other prospective purchasers. Two or three days before March 23 Dunn, having eliminated the other prospects, decided he would like to buy the Abell farm, so he and Dixon went out to see the Abells. Meanwhile, Abell had expressed to Dixon some reservations with regard to the listing, indicating that he would like to sell on a "walk-out" basis (including all of the stock and equipment) for an additional $50,000.

When Dixon and Dunn arrived Abell was working in a field but presently joined them at the milking house. Dunn was not interested in the walk-out proposition, because he thought the price was too high. Then, in Abell's words, "Jesse [Dixon] went on and gave me a sales talk. I'm hard of hearing and I was busy. I again mentioned to him and reminded him to hold up on that listing contract. He still kept on and I finally got a little upset. I told Jesse that I wasn't signing anything, that I had to go milk and that I wasn't signing anything, to go on down to the house and talk to my wife. I didn't think she would sign the contract because it would take seven years to pay it out in. You might say, we are 65 years old and that's getting pretty close to the end of time." Continuing with Abell's testimony:

Q—"What kind of sales talk did he give you?"

A—"He kept saying that I was getting a good price for my farm, that it would save me a lot of taxes and he just kept going over that, telling me about the tax saving and they never did say how much. That's when I told him to go down to the house and talk to my wife. I really didn't think she would sign the contract."

Q—"Did you also tell Mr. Dixon at that time that you wasn't the money man in the family and that you didn't have any head for figures and that Grannie [Mrs. Abell] was the money man and all you did was do the work and he should go down and talk to her?"

A—"I guess so. I don't have any education."

Q—"What happened next?"

A—"Dixon went down to the house."

Q—"And then what happened?"

A—"He came back up there for me to sign the contract."

Q—"The contract that I have just shown you?"

A—"Yes. He told me my wife had signed it. I didn't think she had. He let me see, he showed it to me, and I went ahead and signed."

Q—"Did you read it?"

A—"I've told you my reading is very poor. Jesse didn't read it to me. I just told him to go to the house to talk to my wife."

Q—"Your statement is that you didn't read the contract?"

A—"No, I couldn't read it."

Q—"You can't read, is that your statement?"

A—"Very little."

Q—"Did you talk to your wife before you signed this contract?"

A—"No, she was at the house and I was at the barn."

Q—"Mr. Abell, did you have any discussion with Mr. Dixon about the terms of the financing on the purchase of the farm before you signed this contract?"

A—"No, sir."

Q—"What was it that Mr. Dixon said to you back up at the barn the second time?"

A—"He said that my wife had signed the contract and for me to sign. I said, 'Let me see where she signed.' He showed it to me and I signed. From what I think Mr. Dunn said something to me about giving him a chance on bidding on building a house on the remaining 21 acres."

Q— "Had Mr. Dunn already signed the contract when you signed it?"

A— "Yes, I was the last one that signed it."

\*　\*　\*　\*　\*　\*

Q— "Mr. Abell did you sign of your own free act and deed the sales contract and the listing contract?"

A— "Yes. I signed it."

Q— "You meant to sign it at the time to sell the farm at the time you did, didn't you?"

A— "I signed it to sell the farm but as I say, the contract was misrepresented to us."

Q— "How?"

A— "It was supposed to be paid out in seven years. My wife figured it up and it amounted to ten years."

Q— "Would you now be willing to complete the transfer of the farm to Mr. Dunn if it were financed over a period of seven years?"

BY JUDGE HALL: "I object to that. I instruct you not to answer the question. It would be an entirely new and different contract that doesn't exist in this litigation."

Questions resumed by Mr. Terry:

Q— "Are you now today, Mr. Abell, ready and willing to sign a deed to complete the transfer according to the terms of the sales contract written back in March?"

A— "No."

Q— "Now, in the course of the negotiations on the sale and purchase of this farm on that said March 26, did Mr. Dunn at any time in any way ever misrepresent to you any facts or make any false misrepresentations?"

A— "Mr. Dunn didn't talk to me but very little."

Q— "Your complaint in this case is with Jesse Dixon, is that right?"

A— "That's right."

Q— "And Mr. Dixon was your agent to sell this farm, is that right?"

A— "Right."

Mrs. Abell's version of what took place when Dixon and Dunn arrived at the house from the milking shed is that Dixon informed her that her husband had agreed to sell, and proceeded to sit down and write out the contract, which she signed:

A— "On March 26 Mr. Dixon came down to the house and told me that Slim said for me to sign a contract. Mr. Dixon sat down at the kitchen table and wrote it out. Some girls came to see me and I was with them about twenty minutes and he had the contract written. I very lightly went over it and asked him if Slim had agreed to this and he said, 'yes.' I said, 'It seems to me like the payments are drug out too far,' and he said they had to be drug out for tax purposes."

Q— "Let me clear one thing up—when you refer to 'Slim,' do you mean your husband, W. E. Abell?"

A— "That's right. I said, 'You know if we sell like this that we won't have much money to build a house.' He said we could borrow enough money from the bank. I said it would be funny to sell the farm and not have enough money to build a house with after we paid off the mortgage on the farm and debts on machinery that was still owed. He said that we decided to sell the place on the listing contract and that was for seven years. After he was gone and when I counted out the payments they were for ten years. He misrepresented that contract to me. He didn't say a word about ten years. Mr. Abell will be 65 before long. In ten years he will never live to get the money."

\*　\*　\*　\*　\*　\*

Q— "Did you have any discussion with Mr. Dixon then on how he was figuring the

financing terms on the contract or about your other investments and how much of a down payment you would get?"

A— "I told him we had to have a larger down payment to build us a house. It is no solution to sell the farm if we don't have enough money to build a house. He give me a story about how we could borrow on the money to build a house. It's no solution to do that at our age. That contract is not right for us."

\* \* \* \* \* \*

Q— "One or two final questions—as I understand it, your sole disagreement and dissatisfaction with this refinancing is that it was to be over ten years, is that correct?"

A— "I didn't know it was going to be for ten years."

Q— "Which is why you are dissatisfied?"

A— "That is why we are dissatisfied."

Q— "And why you wanted out?"

A—"That's why."

Dixon's account of the first conversation at the milk house is not substantially different from what Abell said. The 7-year deferred payment plan embraced in the listing contract of February 23 resulted from his concern for the Abells' tax position, but the principal item of discussion on the day the sales contract was signed was the "walk-out" proposition, to which Dunn would not agree. He says that when they got down to dealing for the farm Abell said, "Usually Granny [sic] handles all the money and she knows what we owe and the whole thing. All I do is work. She runs the books," and that when he (Abell) went down to the house he told Mrs. Abell, "Granny, Slim said that you handle all the business end of the farm, the financial end of it. He said for me to come to you to work out the details of the contract with you and anything that you and I work out, he would be agreeable to." He denies having indicated to Mrs. Abell either expressly or impliedly

that her husband had sent him there to get her to sign the contract.

The witnesses agree that when Dixon went to the house to see Mrs. Abell, Dunn stayed in his automobile and was not present during any of the discussion or during the preparation of the contract. Dixon testified that he figured out the schedule of payments on a piece of paper and went over all of it with Mrs. Abell before writing the contract. He said he read the contract out loud and then Mrs. Abell took it and read it, or at least "looked at it long enough" so that he assumed she read it. She started to sign it, but he advised her, "This is not your contract. This is the thing that's going to be acceptable if Dunn will sign it," and went out to the car to have Dunn sign it first. On the latter detail the testimony of Dixon and Mrs. Abell tallies.

Dixon testified positively that he and Mrs. Abell talked about spreading the deferred payments over a 10-year period:

Q— "What was said about that? What did you say?"

A— "There were many things said. The fact that they had this other money, other investments, money invested at 6% interest. I said, 'You've got the farm as security. You know where the money is. You can't get any better investment than this and spreading it over a ten year period is a greater tax advantage than on a shorter term.' I could probably have written it on a five year term."

Q— "Why didn't you write it on a five year term?"

A— "I figured it on a tax standpoint where it was better for the Abells."

Q— "Did the length of term present any consideration with Mr. Dunn in purchasing this property?"

A— "None whatsoever."

Dixon said also that when he returned to the milk house he read the contract to

Abell and Abell read it himself. However, he did not recall having made a point of calling Abell's attention to the fact that the deferred balance was to be payable over 10 years. He knew Abell had investments and was soon to receive a sizeable inheritance,[2] so, "Knowing that Slim had this money coming and that he would have a substantial amount of cash on hand, that was the reason I drew the contract that way and I drew the contract for the protection of the Abells and their investment."

On Sunday morning, the day after the contract was signed, Abell called Dixon, told him that he and Mrs. Abell did not want to sell, and asked him to get them out of the deal. Dixon made an effort to do so, but Dunn would not withdraw.[3] According to Dixon, "I used all the persuasive force that I knew how and still with diplomacy because I still had Dunn as a client. Mr. Abell was still going to pay my commission, so you might almost say I could have a motive."[4]

The findings of fact entered by the trial court state the salient features of the evidence and are consistent with the more detailed account that has been set forth in this opinion, except for the following:

■ It was determined that both of the Abells "were uneducated and with little experience in the business world." There was no evidence that Mrs. Abell is uneducated or that either of them was inexperienced from a business standpoint. To the contrary, the operation of a farm is very much a business. It was found also that "Dixon was acting in a dual capacity as agent for both the plaintiff and the defendants with the knowledge and consent of all concerned." There is nothing whatever in the record to support this finding. Dixon did in one instance refer to Dunn as a "client," but it is utterly clear that he was using it in the sense of past dealings in other transactions and the prospect of future relationships of the same sort. That Dunn had utilized Dixon's services in previous matters would justify Dixon's reference to him as a "client" without its connoting such a connection in this particular instance. It was the Abells and they alone who had employed and had agreed to pay Dixon to effect a sale of the farm. His efforts to bring the parties to terms by negotiating between them, and by exercising persuasion on both, do not warrant an inference that he was a dual agent.

The only other finding on a point of dispute was that when the Abells signed the contract "they each believed that the deferred payments were spread over a seven year period instead of ten years." There was no finding that Dixon told them so or that he made any misrepresentation, that they were overreached, that anyone was guilty of inequitable conduct, or that a hardship would result from specific performance of the contract. Nevertheless, such conclusions seem to lurk between the lines, unspoken but felt, so let it be assumed for purposes of the argument that all the worst of what the Abells say about the transaction is true. Still there is not a shred of testimony that places any blame on Dunn, or provides any reason why he should be deprived of his bargain. If there was any person at fault (and we postulate it only for the purpose of analysis), it was Dixon, and he was the Abells' agent. The old maxim that as between two innocent parties the one who made the injury possible must bear the consequences finds a classic example in this case.

"It is said that as between two innocent persons, one of whom must suffer the con-

2. See Skaggs v. Cook, Ky., 374 S.W.2d 857 (1964).

3. One of Dunn's reasons for refusing to give up the contract was that his lease of other land on which he was pasturing cattle had been terminated.

4. Dixon testified that Abell told him if he could get the Abells out of the deal they would pay his real estate commission anyway. Abell denied this.

sequences of a breach of trust, the one who made it possible by his act of confidence must bear the loss." 27 Am.Jur.2d 683 (Equity, § 147). "It is more consonant with reason that he who puts trust and confidence in the deceiver should be the loser." Id. fn. 8, citing Carpenter v. Logan, 16 Wall (U.S.) 271, 21 L.Ed. 313 (1873). .

 The trial court's conclusions of law were set forth in the form of an enumeration of several general principles of law that apply to specific performance and one statement to the effect that a dual agency may exist with consent of the parties. As we have said, however, with respect to the question of agency the evidence does not sustain a conclusion that Dixon was acting for both parties. The remaining conclusions were to the over-all effect that specific performance is not a matter of absolute right and may be denied if it would result in inequity, and that a party knowing a material ingredient in an agreement will not be permitted to suppress it and still call for specific performance. Most nearly applicable among the cases cited is West Kentucky Coal Company v. Nourse, Ky., 320 S.W.2d 311 (1959), which stands for the proposition that the remedy of specific performance lies within the reasonable, but not arbitrary, discretion of the court and will be decreed only if the plaintiff's hands are entirely clean.

This court as presently constituted holds a strict view of what must be shown in order to defeat the right to specific performance of a valid and enforceable contract for the sale of land. Cf. Graves v. Winer, Ky., 351 S.W.2d 193, 196 (1961). Too broad a judicial discretion tends to dilute the rule of law in favor of rule by human whim. In this case the only hardship, inequity or misunderstanding claimed by the Abells is that the deferred payments run for 10 years instead of seven. The down payment is 4% more than originally contemplated, and the total price is the same. This simply is not a case in which the denial of specific performance would be anything less than arbitrary.

The judgment is reversed with directions that the appellant be awarded specific performance.

All concur.

STEINFELD, J., not sitting.